**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

INTERNATIONAL IP HOLDINGS, LLC and
INNOVATION VENTURES, LLC

      Plaintiffs,

v.                                      Case No. 13-13988

GREEN PLANET, INC.

      Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART PLAINTIFFS' MOTION TO
EXCLUDE THE DECLARATION OF ROBERT J. LAUSON AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pending before the court is Defendant's Renewed Motion for Summary

Judgment as to Plaintiffs' trademark and trade dress infringement claims. This includes

(1) Count I, trademark infringement under 15 U.S.C. § 1114; (2) Count IV, false

designation of origin or sponsorship under 15 U.S.C. § 1125(a); (3) Count V, common

law trademark infringement; (4) Count VI, common law trade dress infringement; (5)

Count VII, common law unfair competition; and (5) Count VIII, a claim under the

Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903. (Dkt. # 66.)

Defendant also seeks summary judgment of the dilution claim in Count II of Plaintiffs'

complaint. (*Id.*)[1] Plaintiffs have filed a response (Dkt. # 76) to which Defendant's have

replied (Dkt. # 81.). Relatedly, Plaintiffs have moved to exclude the declaration of

Robert Lauson, an attorney of record in this matter. (Dkt. # 74). Defendant has filed a

---

[1] The instant motion does not address Count III, Plaintiffs' copyright claim.

Response to that motion (Dkt. # 78), and Plaintiffs have replied (Dkt. # 82). Thus, these matters have been fully briefed and the court concludes that a hearing is unnecessary. *See* E.D. LR 7.1(f)(2). For the following reasons, the court will grant in part Plaintiffs' Motion to Exclude and also grant Defendant's Motion for Summary Judgment.

## I. BACKGROUND

Plaintiffs sell an "energy shot" beverage, "5-hour ENERGY," in two-ounce cylindrical bottles with screw top lids in varying flavors and strengths. Some flavors and strengths are distinguished from the others by different color labels. Plaintiffs aggressively protect their intellectual property and have litigated, primarily in this district and the Sixth Circuit, a number of infringement suits against various other energy-product manufacturers. *See, e.g.*, *Innovation Ventures, LLC v. Bhelliom Enters. Corp.*, 529 F. App'x 560 (6th Cir. 2013); *Innovation Ventures, LLC v. N.V.E., Inc.*, 747 F. Supp. 2d 853 (E.D. Mich 2010), *rev'd in part* 694 F.3d 723 (6th Cir. 2012).

Defendant also sells an energy shot, "8 HR BUZZ," but sells its product in a one-once paper pouch with a paper seal that can be snapped or torn off. The two products are shown below.



**II. STANDARD**

2

A court will enter summary judgment only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Additionally, the court's role is not to weigh the evidence and rule on the truth of the matter, but to determine whether there is a genuine issue to be considered at trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Summary judgment, therefore, is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52 (1986).

## III. DISCUSSION

As a preliminary matter, the court addresses Plaintiffs' Motion to Exclude the Declaration of Robert Lauson. Rule 56 of the Federal Rules of Civil Procedure provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." While the court agrees that some portion of Mr. Lauson's declaration would not be admissible, the court

3

"should use a scalpel, not a butcher knife" in striking portions of the declaration that do not satisfy Rule 56. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir. 2009) (quoting *Giles v. Univ. of Toledo*, 241 F.R.D. 466, 469 (N.D. Ohio 2007)). Portions of an attorney declaration that take the opportunity to lobby the court with unsupported facts or legal conclusions may be stricken. *See Degelman Indus., Ltd v. Pro-Tech Welding and Fabrication, Inc.*, No. 06-cv-6346, 2011 WL 6754053, at *3 (W.D.N.Y. May 31, 2011) (citing *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d. Cir. 1999)).

The court agrees that the first sentence of paragraph five ("Plaintiffs' 'color fade' trade dress . . . is weak and likely invalid as evidenced by third party use.") asserts a legal conclusion and should be stricken. Additionally, Mr. Lauson's statement that "[t]he 'color fade' is common among 2 oz energy shots" is opinion testimony that will also be stricken.

However, Plaintiffs remaining concerns with the Lauson declaration are unfounded. Mr. Lauson does not present himself as an expert on the energy-shot market. Excepting those portions the court has already stricken, he instead simply presents observations he has personally made when viewing displays of related products in grocery and convenience stores. The other arguments advanced by Plaintiffs are essentially semantic or ask the court to weigh the evidence presented in the declaration. For example, Plaintiffs take issue with Mr. Lauson's statement in paragraph two that the "Examiner approved the mark," seeking to clarify that the mark was "approved for publication" and not "approved for registration." Plaintiffs also complain that Mr. Lauson "hand-picked" the other energy shots highlighted in the declaration, presumably arguing that they are not representative of the energy-shot

4

market at large. These complaints are not grounds for striking portions of the declaration, they are complaints about the strength of Defendant's evidence.

Moving to consideration of the claims, although seven separate claims are at issue here, the claims can be grouped into two buckets: the infringement claims and the dilution claim. The court will first address the infringement claims and then consider the dilution claim.

### A. The Infringement Claims and Likelihood of Confusion

Defendant's' Motion first attacks Counts I, IV, V, VI, VII, and VIII of Plaintiffs' Complaint, which are various federal and state trademark and trade dress infringement claims that all rise or fall under the same likelihood of confusion test. *See Leelanau Wine Cellars, Ltd. V. Black & Red, Inc.*, 502 F.3d 504, 521 (6th Cir. 2007). The Lanham Act prohibits the use of "any word, term, name, symbol, or device, or any combination thereof" that "is likely to cause confusion . . . as to the origin, ownership, or approval of his or her goods." 15 U.S.C. § 1125(a). To prevail on the infringement claims, Plaintiffs must show that Defendant's marks create a likelihood of confusion as to the origin of the goods offered by Plaintiffs and Defendant. *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723 (6th Cir. 2012). Both trademark and trade dress claims are subject to the same likelihood of confusion standard. *See Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 509 (6th Cir. 2013). In determining whether a likelihood of confusion exists, the Sixth Circuit considers the following factors:

> (1) the strength of the plaintiff's mark, (2) the relatedness of the goods or services offered by the plaintiff and the defendant, (3) the similarity of the marks, (4) any evidence of actual confusion, (5) the marketing channels used by the parties, (6) the probable degree of purchaser care and

5

sophistication, (7) the defendant's intent in selecting its mark, and (8) the likelihood of either party expanding its product line using the marks.

*Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). While not every one of the *Frisch's* factors will be relevant in every case, "the ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Therma-Scan, Inc v. Thermoscan, Inc.*, 295 F.3d 623, 630 (6th Cir. 2002). Whether confusion exists "is a mixed question of fact and law," but the ultimate determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion." *Id.* at 630-31.

Before proceeding to evaluate the factors, the court must first grapple with Sixth Circuit precedent set in an earlier 5-hour ENERGY case. In *Innovation Ventures,* 694 F.3d at 727, the Sixth Circuit reversed a district court's grant of summary judgment to the defendant, the producer of 6 Hour POWER. The district court had found that factors two, five, and six weighed in favor of 5-hour ENERGY, and that factors one, three, four, and seven weighed in favor of 6 Hour POWER; the eighth factor was not relevant. Reversing, the Sixth Circuit noted that the case was a "close call" but concluded that "when the factors are so evenly balanced—a 4 to 3 split . . . precedent counsels in favor of not granting summary judgment." *Id.* at 733. Plaintiffs argue that *Innovation Ventures* controls in this case where, with the evidence viewed in the light most favorable to Plaintiffs, they prevail on a majority of the relevant factors.

The court agrees that tallying wins and losses on each factor indicates that, as a purely mathematical matter, Plaintiffs should survive summary judgment. That is, if

6

Plaintiffs' reading of *Innovation Ventures* is correct, then the court's hands are tied. However, Plaintiffs' view reduces the *Frisch's* eight-factor test to an exercise in bean counting and the court concludes that this cramped reading of the opinion is inconsistent with prior Sixth Circuit precedent. Moreover, such a reading could have unwanted results, especially at the summary judgment phase in cases like this.

First, earlier Sixth Circuit precedent indicates that the *Frisch's* test gives district courts more leeway in weighing the eight factors. The factors "imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Leelanau Wine Cellars*, 502 F.3d at 515 (quoting *Homeowners Group v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)). "The general concept underlying likelihood of confusion is that the public believe that the mark's owner sponsored or otherwise approved of the use of the trademark." *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 834 (6th Cir. 1983).

It follows that, in some cases, a very strong showing on a small set of factors may effectively render the other factors irrelevant. This may be especially true when the products at issue are highly dissimilar. *See Daddy's*, 109 F.3d at 283 ("Similarity of marks is a factor of considerable weight."). For example in a trade dress case the Sixth Circuit explained,

> [w]hen the trade dresses are so "clearly distinguishable and would appear so to all but the most obtuse consumer," *Haagen-Dazs*, 493 F. Supp at 75, that court may resolve the issues of the dresses' similarity as a matter of law, *the defendant's resounding success on this factor makes plaintiff's burden on prevailing on the seven other Frisch's factor's effectively insurmountable.* A strong visual impression of dissimilarity ordinarily "recieves great weight in determining the liklihood of confusion." *TrafFix*, 200 F.3d at 934 (citing *Kangol, Ltd v. Kangaroos U.S.A., Inc.*, 974 F.2d 161, 163 (Fed. Cir. 1992)), *rev'd on other grounds*, 532 U.S. 23. Moreover,

7

> "[w]hat is important is not whether people will necessarily confuse the marks, but whether the marks will be likely to confuse people in believing that the goods . . . emanate from the same source." *Kangol*, 974 F.2d at 163.

*Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 648 (6th Cir. 2002) (emphasis added).

In *Innovation Ventures* the products were not clearly distinguishable to all but the most obtuse consumers. Indeed, the 6 Hour POWER product in that case was notably similar to 5-hour ENERGY—it came in a small red plastic bottle with wording that was displayed in a fashion that quite closely mimicked Plaintiffs product. Pictures of the products in that case are provided here to illustrate the point:

Thus, the court in *Innovation Ventures* did not have a reason to opine about what effect more extreme




dissimilarity might have on the balance of factors.

Other circuits have also concluded that a high level of dissimilarity can be dispositive, or nearly so, in the likelihood of confusion analysis. *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999) ("Where the two marks are entirely dissimilar, there is no likelihood of confusion."); *Kellogg Co. v. Pack'em Enters.*, 951 F.2d 330, 332-33 (Fed. Cir. 1991) (stating that "[w]e know of no reason why, in a particular case, a single [test] factor may not be dispositive" and holding that "substantial and undisputed differences" between two competing marks justified a conclusion of no likelihood of confusion on summary judgement). In such a multi-factored test, it is sensible to place the factors on a sliding scale, such that a strong showing on one or two factors may lessen the burden on other factors.

Plaintiffs' view of *Innovation Ventures* is also concerning because of the result it will dictate in many cases. If that case requires a strict mathematical weighing of the factors, then many plaintiffs (especially those with an established brand) will win an almost automatic pass to a trial when suing products in the same market—*regardless of how dissimilar the products are*. In casual consumer markets, a plaintiff suing a direct competitor almost invariably "wins" factors two (relatedness of the goods), five (the marketing channels used by the parties), and six (the probable degree of purchaser care and sophistication). Under Plaintiffs' reading of *Innovation Ventures*, this is enough to survive summary judgment.

The problem is exacerbated in cases where a mark is inherently weak because it uses a suggestive or description brand name, but the plaintiff can show some investment in advertisement. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's*

9

*Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) (a mark may be strong due to its uniqueness *or* intensive advertising). Then, at summary judgement, the plaintiff will likely prevail on the first factor (strength of the mark) and further lock in his apparent entitlement to a full-blown trial. All this without the court even having the opportunity to consider whether the products look alike in the slightest.

The danger here is apparent and, the court believes, exemplified by this case. In this environment, established brands claiming protection over words like "energy" in the energy-shot market can easily use the threat of expensive trademark litigation to bully newcomers out of the market. Therefore, heeding the Sixth Circuit's warning to avoid a mathematical approach to trademark cases, the court rejects Plaintiffs' reading of *Innovation Ventures.* A quick glance at the products shows that that case was close; this case is not. As discussed below, the court concludes that though Plaintiffs prevail, in a mathematical sense, on a majority of the factors, Defendant's overwhelming showing of dissimilarity, and Plaintiffs' relatively weak showing concerning the factors on which it does prevail, leaves no genuine issue of material fact as to the likelihood of confusion.

Looking to the individual factors, as expected in this type of case, Defendants do not contest that factors two, five, and six favor Plaintiffs. The products are both energy shots, sold and marketed largely in convenience stores, and purchased with a low level of scrutiny or care. Additionally, because the product lines are identical, the eighth factor is not relevant in this case. *Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006). Thus, the court is left to consider only the strength of the marks, the similarity of the marks, evidence of actual confusion, and Defendant's intent in selecting its marks.

10

**1. Strength of the Marks**

The first factor to consider is the strength of the mark or marks. Plaintiffs argue that the Sixth Circuit has, on multiple occasions, found that 5-hour ENERGY is a "suggestive and protectable mark." Pls.' Mem. 7 (collecting cases). However, that the Sixth Circuit has held that the 5-hour ENERGY mark meets the minimum threshold to warrant protection says little about the *strength* of the mark.

Courts look to the "distinctiveness of the mark and its recognition among the public" in considering this factor. *Therma-Scan, Inc.*, 295 F.3d at 631. "The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due." *Daddy's*, 109 F.3d at 280. The Sixth Circuit has explained that "[a] mark is strong and distinctive when the public readily accepts it as the hallmark of a particular source; such acceptance can occur when the mark is unique, when it has received intensive advertising, or both." *Id*. In evaluating the uniqueness and strength of a mark, courts also consider Judge Friendly's now-classic taxonomy for analyzing marks. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000); *Therma-Scan, Inc.*, 295 F.3d at 631. The Friendly test categorizes marks on a spectrum, with the strongest marks identified as fanciful or arbitrary and the weakest identified as suggestive or descriptive. The Sixth Circuit has applied the test in evaluating the strength of a mark and described it as follows:

> [t]rademarks are generally categorized as fanciful, arbitrary, suggestive or descriptive. A "fanciful" mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned (*e.g.*, Exxon, Kodak). An "arbitrary" mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached (*e.g.*, Camel cigarettes or Apple computers). Fanciful and arbitrary marks are

11

considered the "strongest" or most distinctive marks. Encroachment on a strong mark tends to produce the greatest liklihood of confusion. "Suggestive" and "descriptive marks either evoke some quality of the product (*e.g.*, Easy Off, Skinvisible) or describe it directly (*e.g.*, Super Glue). Such marks are considered "weaker," and confusion is said to be less likely where weak marks are involved.

*Little Ceaser Enters., Inc. v. Pizza Caeser, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987).

Addressing Judge Friendly's test first, other courts have found that the 5-hour ENERGY wordmark is weak because of its descriptive nature. *Innovation Ventures, LLC v. N.V.E., Inc.*, 747 F. Supp. 2d 853, 868 (E.D. Mich. 2010) *rev'd in part on other grounds* 694 F.3d 723 (6th Cir. 2012). It is clear the mark is not fanciful or arbitrary because its name describes or at least suggests what the product is supposed to do—provide "energy" for "five hours." In fact, when Plaintiffs first applied to register the 5-hour ENERGY trademark, the Patent and Trademark Office denied the application on the grounds that the name was descriptive. *Innovation Ventures*, 694 F.3d at 727. The court agrees that due to the suggestive or descriptive nature of the 5-hour ENERGY mark, the Friendly test indicates that the mark is inherently weak.

Plaintiffs also assert protection over the "color fade" associated with the 5-hour ENERGY brand, which is a federally registered trade dress, Registration No. 4,315,511.[2] Throughout the briefing, Plaintiffs seem to assert that they have a

---

[2] Trade dress, as opposed to a trademarked symbol or wordmark, "refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that marks the source of the product distinguishable from another and promotes its sale." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002). The Lanham Act's protection of trademarks also extends to trade dress. *Gray v. Meijer, Inc.*, 295 F.3d 641, 645 (6th Cir. 2002). Trade dress claims are subject to the same likihood of confusion standard as trademark claims, *Groeneveld Transport Efficiency, Inc. v. Lubecore Intern., Inc.*, 730 F.3d 494, 509 (6th

protectable interest in the color fade itself, divorced from the rest of the packaging and presentation of the 5-hour ENERGY products. Relatedly, Plaintiffs frequently and confusingly refer to the color fade as a trademark. It is unclear whether this is due to imprecise drafting or a calculated attempt to isolate and emphasize components of its trade dress that it claims Defendant has infringed (the color scheme), while downplaying other parts of its trade dress that Defendant has clearly not adopted (the bottle). To be sure, the color fade is a *part* of Plaintiffs' trade dress, but it cannot be considered in isolation. As is apparent from both the trade dress application and registration, (Dkt. ## 76-12, 76-13), Plaintiffs' claim to the color-fade trade dress is intimately associated with the fade's placement on the distinctively shaped bottle in which all 5-hour ENERGY products are sold. Both documents describe the mark as follows: "The mark consists of a three dimensional packaging having a generally cylindrical body with a generally rounded shoulder portion and a generally cylindrical top above the generally rounded shoulder portion and further consisting of a transitioning color scheme from red to orange to yellow." (*Id.*) As will be addressed, Plaintiffs' argument that the rest of the 5-hour ENERGY packaging is somehow irrelevant to the court's analysis runs through several of the issues raised by the instant Motion.[3] This flaw has led Plaintiffs to

_____

Cir. 2013), and thus the court will consider the separate trademark and trade dress claims simultaneously, distinguishing between the two claims where necessary.

[3] To the extent Plaintiffs actually are asserting that the color fade alone is a protectable trade dress, which would be inconsistent the citations to Trademark No. 4,315,5411, Plaintiffs have made no effort to show that such trade dress would be distinct enough to warrant protection. *See Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 635 (6th Cir. 2002). The court would find that the color fade alone is not distinct in the market and therefore not entitled to protection.

13

overstate the strength of their marks, overestimate the similarity of Plaintiffs' and Defendant's products,[4] and introduce errors in their expert's report.[5]

Alluding to Judge Friendly's test, Plaintiffs claim in passing, with no elaboration or support, that the color fade is arbitrary or fanciful and therefore inherently strong. The court is not convinced. The selection of this color fade (red, to orange, to yellow) rather obviously is *suggestive* of a rising sun, which invokes the energy-imparting function of the product. This is especially clear given that the color fade provides the background for a runner, shown in silhouette and dashing up a hill or mountain. This effect brings to mind nothing more or less than an invigorating morning exercise. Other courts have noted this likeness, as well. *Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 718 (2015). The use of the familiar and utterly natural colors of a rising sun for a product that is meant to provide wake-up energy for its user can hardly be described as arbitrary. The color fade is, inherently, a weak mark as well.

"Because the strength of a trademark for purposes of the likelihood-of-confusion analysis depends on the interplay between conceptual and commercial strength, the existence [or lack thereof] of inherent distinctiveness is not the end of the inquiry." *Maker's Mark Distillery, Inc. v. Diageo N. Am. Inc.*, 679 F.3d 410, 419 (6th Cir. 2012). Though the 5-hour ENERGY wordmark and trade dress are inherently weak, intensive advertising may create in the public an impression that the marks indicate a particular source, thus strengthening the marks. *Daddy's*, 109 F.3d at 280. Accordingly, Plaintiffs

---

[4] *See infra* Part I.A.2.

[5] *See infra* Part I.A.3.

14

advance evidence of the product's wide circulation and large advertising budget, arguing that these compel the conclusion that the mark is strong.

However, the mere fact that a product has a large advertising budget "has an attenuated link to actual market recognition." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1108 (6th Cir. 1991). Especially in the trade dress context, advertising that does not highlight the aspects of a product that a plaintiff seeks to protect does little to strengthen the public's connection between an aesthetic feature of the product and its source. *See Maker's Mark*, 679 F.3d at 420.

For example, in *Maker's Mark*, intensive advertising by the bourbon producer Maker's Mark strengthened its claim to trade dress protection in the red dripping wax at the top of its bottles because the large advertising budget focused "almost entirely on branding the red dripping wax." *Id.* In contrast, here, Scott Henderson, President of Innovation Ventures (the owner of 5-hour ENERGY), testified that the company's advertising does not focus on the color fade and does not tell customers to look for the color fade when shopping for 5-hour ENERGY products. (**SEALED** Decl. Scott Henderson, Dkt # 86-3, Pg ID. 2202.)

Further, Plaintiffs do not uniformly use this color fade pattern for all products; fully half of Plaintiffs' products are produced and marketed without the color fade. (Pls.' Counter Statement of Material Facts ¶ 22, Dkt. # 76, Pg. ID 1415.) Other aspects of Plaintiffs' trade dress *are* used uniformly across its products. The 5-hour ENERGY wordmark, the silhouette of a running man, and the distinctly shaped bottle are, for example, used on both the regular-strength products (50% of Plaintiffs' business) and on the extra-strength products (40% of Plaintiffs' business), whereas the red-orange-

15

yellow color fade appears only on regular-strength products. That Plaintiffs don't use the color fade as uniformly as other aesthetic features of the product line indicates that the color fade is relatively weak—apparently dispensable—trade dress. In fact, courts have held that when trade dress is asserted as to a family of products, features that are not used consistently are not entitled to protection at all. *AM General Corp. v. DaimlerChrylser Corp.*, 311 F.3d 796, 815 (7th Cir. 2002). While this court need not, and does not, go so far as to say that the color fade is not protectable trade dress, its inconsistent use weighs in favor of Defendants. The court concludes, as to the trade dress claims, that advertising and commercial success have not appreciably strengthened the inherently weak color-fade trade dress.

As to the 5-hour ENERGY symbol and wordmark, however, the court concludes that advertising and commercial success have somewhat strengthened the mark. Plaintiffs have put forth surveys from various experts attesting to the public's strong reaction to the 5-hour ENERGY name brand. (Jay Declaration, Dkt. # 76-18; **SEALED** Marylander Declaration, Dkt. # 86-4.) Additionally, the Sixth Circuit has previously noted that a jury might reasonably rely on such evidence and conclude that 5-hour ENERGY is a strong wordmark. *Innovation Ventures*, 763 F. 3d at 535. However even in viewing the evidence in the light most favorable to Plaintiffs, the 5-hour ENERGY trademark cannot completely overcome its inherent weakness; it is not, for example, as strong a mark as Exxon or Kodak which are both arbitrary and strengthened through advertisement. Therefore, this inherently weak mark that has been strengthened somewhat by advertising gives Plaintiffs a slight advantage on this factor.

16

In sum, as to the trade-dress claims, this factor favors Defendants. With regard to the trademark claims, this factor slightly favors Plaintiffs.

### 2. Similarity of the Marks

"The similarity of the senior and junior marks is 'a factor of considerable weight.'" *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 795 (6th Cir. 2004). "When analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks." *Id.* While a side-by-side comparison of the litigated marks is not appropriate, the commonalities of the respective marks must be the point of emphasis. *Id.* "[C]ourts must determine whether a given mark would confuse the public when viewed alone." *Id.* Additionally, the Sixth Circuit recognizes the "anti-dissection rule," whereby courts "view marks in the entirety and focus on the overall impressions, not individual features." *Daddy's*, 109 F.3d at 283; *see also Little Caesar*, 834 F.2d at 572 (quoting Professor J. Thomas McCarthy, *Trademarks and Unfair Competition* § 23:15 (2d ed. 1984)) (A trademark "should not be split up into its component parts and each part then compared with parts of the conflicting mark to determine the likelihood of confusion. It is the impression which the mark as a whole creates on the average reasonably prudent buyer and not the parts thereof which is important.").

While there are some similarities between the 5-hour ENERGY and the 8 HR BUZZ products, the readily apparent and numerous differences far outweigh those similarities such that the likelihood of confusion is extremely small. The court finds that this factor weighs heavily, indeed almost dispositively, in favor of Defendant with regard to both the trade dress and trademark claims.

First, Plaintiffs present a wildly inflated view of what uses their trademarks protect against. They complain of Defendant's use of the "number-hour-synonym for energy" naming format—as Plaintiffs dub it—but their trademarks do not protect that naming scheme. Plaintiffs test the bounds of what may be trademarked even by defending the use of the term "energy" in the energy-shot market. The court rejects the implication that 5-hour ENERGY has the exclusive right to use time units and synonyms for energy in naming an energy shot. "8 HR" and "BUZZ" are distinct alternatives to Plaintiffs' "5-hour" and "ENERGY." Any other conclusion would severely and unfairly limit all competitors in the energy-shot market.

Additionally, overall, the 8 HR BUZZ trademark is notably different in appearance compared to the 5-hour ENERGY trademark. The words in the two marks are different, though consumers likely pronounce "HR" and "hour" the same for both products. The 8 HR BUZZ name appears in a more stylized fashion, displaying the words in both italics and written on an upward slant, followed by an aesthetic flourish from the forward-pointing arrow. Also, the words themselves are colored and the "U" and first "Z" in BUZZ overlap for a graphic effect that has no counterpart in the 5-hour ENERGY mark. The 5-hour ENERGY mark is italicized, but otherwise is simply printed in black and presented horizontally across the bottle.

Even more striking are the differences in the trade dress. Plaintiffs' product is a small plastic cylindrical bottle with a cap. Defendant's product is noticeably larger, in a rectangular shape, made of treated paper, and has no cap, but instead utilizes a tear-off paper seal. Overall, the most prominent color on Defendant's product is black, while the top half of Plaintiffs' product is mostly red, and the bottom half is multicolored, with a mix

18

of yellow, blue, and black. When asked, Scott Henderson agreed that the 5-hour ENERGY shots are often referred to as the product "in the little red bottles." (Dkt. # 86-3, Pg. ID 2202.) If this is how many consumers see Plaintiffs' product—as a "little red bottle"—then the likelihood of confusing 5-hour ENERGY with another product that is presented in a relatively large black paper pouch is low.

Even looking at the color fade in isolation, the fades are presented differently on each product. 5-hour ENERGY uses the fade as a backdrop covering the whole bottle. 8 HR BUZZ uses the color fade only in its lettering. Additionally, while Plaintiffs' color fade (from top to bottom) is red-orange-yellow, Defendant's differs, fading from yellow to orange to red, and then back to orange and then yellow.

The obviously different trade dress also magnifies the dissimilarity of the word and symbol marks discussed above. Plaintiffs argue that "the package form . . . is not relevant where Defendant has employed Plaintiffs' marks on the same type of *product*." (Pls.' Br. 14 (emphasis in original).) Plaintiffs cite no case that stands for this proposition, perhaps because there are none. Authorities decidedly disagree. Professor McCarthy has opined on this matter, stating that courts should compare "[t]he overall effect of 'background' such as shape, color and design of packaging and containers . . . to see if that background is likely to intensify or lessen possible confusion between conflicting word or design marks." *Trademarks and Unfair Competition* § 23:60 (4th ed.). "The issue is the degree to which buyers perceive the background against which the marks are displayed." *Id.* Thus, packaging is relevant, even in considering the likelihood of confusion as to only the symbol and wordmarks. This is especially true in a market where many other products are sold in small plastic bottles similar to each other.

19

Defendant's paper pouch, distinct from Plaintiffs' bottled product presentation, bucks the packaging trend in the relevant market (and perhaps, although it is not overtly argued, implicitly engages the time-honored paper-vs.-plastic argument), lessening further the likelihood of confusion.

Viewed as a whole, Defendant's and Plaintiffs' marks and trade dress are markedly dissimilar, making the likelihood of confusion extremely low.

### 3. Evidence of Actual Confusion

The fourth *Frisch's* factor is evidence of actual confusion. Evidence of actual confusion is probative in the likelihood of confusion analysis, "but it does not follow that any type or quantum of evidence is entitled to significant weight in the determination." *Homeowners*, 931 F.2d at 1110. Plaintiffs advance two types of evidence in the effort to show actual confusion: (1) comments from a handful of consumers on Defendant's website using the name 5-hour ENERGY instead of 8 HR BUZZ; (2) and Mr. Rappaport's survey, which "reported a confusion rate of above 16%." (Pls.' Mem. 18.) The court concludes that both of these types of evidence are flawed and that this factor favors neither party.

Plaintiffs present five isolated comments from consumers who entered a free giveaway contest hosted on Defendant's website and used some form of the phrase 5-hour ENERGY instead of 8 HR BUZZ. For example, one commenter stated, "helps me stay awake to study for finals!!!! I need all the energy I can get! 5 hour energy always helps me." (Dkt. # 76-25.) The court affords these comments little weight. "Where the parties have been doing business in the same area for some time and where they have advertised extensively, isolated instances of actual confusion are not conclusive or

20

entitled to great weight in the determination." *Homeowners Group*, 931 F.2d at 1110.

"Indeed, the existence of only a handful of instances of actual confusion after a

significant time or a significant degree of concurrent sales under the respective marks

may even lead to an inference that no likelihood of confusion exists." *Id.* As Plaintiffs

have noted, they control about 90% of the energy-shot market and were one of the first

to successfully market such a product. It is not surprising that some consumers use

Plaintiffs' brand as a generic synonym for energy-shot products.

Additionally, '[s]hort-lived confusion or confusion of individuals casually

acquainted with a business is worthy of little weight." *Id.* (quoting *Safeway Stores, Inc. v.

Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982)). The incidents

Plaintiffs cite here fall comfortably within this category. For example, one comment

states, "I'm in love with energy drinks but have never had a 5-hour energy shot. Can't

wait to try it and become your next loyal customer." (Dkt. # 76, Pg. ID 1441.) This

consumer is not one that has closely examined the products at issue; he has never

even tried the products and was merely willing to spend a few seconds typing a

message on social media in order to win a free sample. Even viewing this evidence in

the light most favorable to Plaintiffs, the court cannot accord these five isolated

comments any significant weight as evidence of confusion.

As to the second type of evidence—Mr. Rappeport's survey purportedly showing

a 16-18% confusion rate—the court finds that these survey results are unreliable, would

be excluded from trial, and should not be considered here. Mr. Rappeport used

questionable controls and an unexplained and flawed method in applying the control

results. Additionally, Mr. Rappeport's study was designed around counsel's legally

unsupported conclusion that packaging is irrelevant in this case.

> Federal Rule of Evidence 702 states:
>
> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon facts or data, (2) the testimony is the product
> of reliable principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

As such, the trial court is to act as a gatekeeper by excluding unsupported, unreliable,

and speculative expert opinion from trial. *See Daubert v. Merrell Dow Pharmaceuticals*,

509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152

(1999). However, determining that an expert's opinion is reliable is not the same as

determining that it is correct, which is for the trier of fact to decide. "The task for the

district court in deciding whether an expert's opinion is reliable is not to determine

whether it is correct, but rather to determine whether it rests upon a reliable foundation,

as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litigation*, 527

F.3d 517, 529-30 (6th Cir. 2008). And while exclusion is the exception, rather than the

rule, *id.* at 530, the trial court has an obligation to scrutinize the principles and

methodology used by an expert, to "ensure that any and all scientific testimony or

evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.

The controls used in Mr. Rappeport's survey were not adequate. According to

one researcher cited by both parities, "[i]n designing a survey-experiment, the expert

should select a stimulus for the control group that shares as many characteristics with

the experimental stimulus as possible, with the key exception of the characteristic

22

whose influence is being assessed." Shari Seidman Diamond, *Reference Guide on Survey Research* 359, 399 (3d ed. 2011). Mr. Rappeport himself opined that the best controls are "as close as possible" to the "stimulus claimed to infringe." Michael Rappeport, *Design Issues for Controls*, *in Trademark and Deceptive Advertisement* 217, 225 (2012). With this principle in mind, it is passing strange that Mr. Rappeport would chose a Chocolate Chip Peanut Crunch Cliff Bar as a reasonable control.

Here, Mr. Rappeport chose controls dramatically different from both 5-hour ENERGY and 8 HR BUZZ. First, only one of the five controls was in the energy-shot market (Vital4U Liquid Energy), and it was a coffee-flavored product, which neither Plaintiffs nor Defendant make. Thus no control fell within the specific product market that the relevant products fit within—fruit (or at least non-coffee) energy-shot products. The other controls were even worse: the mentioned chocolate chip peanut crunch nutritional bar (the Cliff Bar), a water flavoring drop with some energy component (the Mio Energy Liquid Water Enhancer), an energy-imparting dissolvable mint-flavored sheet that is placed on the tongue (Mint Extra Strength Energy Sheets), and an energy gel (GU Energy Gel). Aside from this product-market problem, none of the other controls included any durational or time aspect to their naming scheme, which both of the test stimuli do.[6]

---

[6] Plaintiffs have faced this and other problems with similar expert reports. *See, e.g.*, *Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703 (E.D. Mich. 2015) (Berg, J.) (excluding expert report based on improper controls, among other flaws); *Innovation Ventures, LLC v. N2G Distributing, Inc.*, No. 08-10983, 2011 WL 6010206 (E.D. Mich Nov. 30, 2011) (Borman, J.) (same).

Illuminating the chosen controls, in a section of Mr. Rappeport's expert report, "One Factor Affecting the Choice of Appropriate Controls for This Study," he notes that Defendant's product is sold in a pouch and states, "based on advice from counsel, we understand that any confusion related primarily to the package type is not relevant in this case. Because of this, the controls in this case were selected to include products that came in different types of packaging." (Dkt. # 86-6, Pg. ID 2339.) This instruction from counsel reflects the legal flaw, discussed above, in Plaintiffs' theory of the case. Plaintiffs have failed to appreciate the importance of the packaging to this case.[7]

That many other products in the energy-shot market are packaged in small, round plastic bottles, and that Defendant's flat, paper-pouch packaging is so dramatically different, are market realities substantially lessening any likelihood of confusion here. The Rappeport survey does not even attempt to grapple with that reality because Plaintiffs' counsel instructed him not to do so. By giving that instruction, and guiding the expert to shape his study around an incorrect proposition of law, Plaintiffs have rendered their survey unreliable. Perhaps it would be extremely difficult to construct a survey that would account for this legally significant fact in the energy-shot market, but even if that were the case, it does not bear on the reliability of the instant survey.

This problem is compounded by Mr. Rappeport's methodology in accounting for the controls, which is highly suspect and also affected by the legal error introduced into the study by Plaintiffs' counsel. As Mr. Rappeport discusses in his report, controls are

---

[7]See *supra* Part I.A.2 at 17-18.

meant to cancel out the "statistical noise" created by survey conditions. (Dkt. # 86-6, Pg. ID 2339.) For instance, the tendency of some respondents to simply guess creates some error. Using the control, researchers will take the level of response to the test stimulus and subtract the response that the control received. By way of illustration, if 50% of people associated an accused product with a plaintiff's product, and 10% of those people also associated (for some reason) a non-infringing control with the plaintiff's product, then one might reasonably say that there was 10% "noise" and that the actual rate of confusion was not really 50%, but closer to 40%.

The situation is slightly more complicated in this case because Mr. Rappeport used up to 5 other controls (in some cases he only used 4 controls). An article that Mr. Rappeport wrote, and that Plaintiffs cite, states that when determining the right amount of noise to subtract where multiple controls are used "the most direct way . . . is to use either the largest value [of noise from any of the controls], or some combination of the . . . values (e.g. the average, or the average of the two largest values)." Michael Rappeport, *Design Issues for Controls, in Trademark and Deceptive Advertising Surveys: Law, Science, and Design* 217, 239 (2012). Mr. Rappeport did two calculations to account for noise control: (1) the average of all the controls, which resulted in a 16% confusion rate and (2) the average of all the controls except the control with the highest value, which resulted in an 18% confusion rate. Mr. Rappeport justified excluding the highest value control, the Mio Energy Liquid Water Enhancer, due to the fact that some survey respondents picked it because it comes in a small plastic bottle. (Dkt. # 86-6, Pg. ID 2344.) Notably, the bottle is rather different from the 5-hour ENERGY bottle (it is not cylindrical nor does it have a twist top) and Mr. Rappeport did not indicate how many

25

people chose the Mio product for this reason. Thus, again, counsel's instructions as to the legal significance of the packaging tainted the study. Because the instructions appear to have motivated Mr. Rappeport to alter his methodology (as to both selection of the controls and how he accounted for the control data), and because the basis for those instructions was incorrect, the court cannot say that the method was reliable. The opinion should be excluded from consideration here.

When Mr. Rappeport used all 5 controls, 21% of responders associated the Mio product with 5-hour ENERGY and 26% drew the association between 8 HR BUZZ and 5-hour ENERGY. (*Id.* at Pg. ID 2343.) Mr. Rappeport essentially sandbagged the control calculations by including in the average the low level of noise generated by poor controls like the Cliff Bar. He then magnified this effect by excluding from the average the control that identified the most noise. The high level of noise caused by the Mio product reinforces the court's conclusion that packaging is very important in this case, and a study that systematically avoids accounting for this legal and market reality is unreliable and unhelpful. Further, these numbers show that even if the court were to consider this flawed study, it is extremely weak evidence of actual confusion - in some cases apparently reflecting only about a 5% confusion rate (26% confusion minus the 21% noise identified by the Mio control).

Given the insignificant weight afforded to a small number of incidents of confusion by casual consumers, and the unreliability of Mr. Rappeport's survey, the

26

court finds that this factor favors neither party.[8] Even considering the survey, the court would not give significant weight to such flawed and weak evidence.

### 4. Defendant's Intent

Plaintiffs have advanced evidence that could indicate an intent to infringe, though the court cautions that much of Plaintiffs' evidence would also be consistent with completely permissible efforts to emulate a successful product. *See Innovation Ventures,* 694 F.3d at 733. However, interpreting evidence in such a way would be inconsistent with the court's duty at the summary judgment phase. Plaintiffs have proffered evidence that Defendant copied 5-hour ENERGY's caution label, copied portions of the Frequently Asked Questions section of 5-hour ENERGY's website, and allowed (or even affirmatively approved) comments on its website that conflate the two products. All of this could be viewed as competent circumstantial evidence of intent to infringe, and thus the court finds that this factor favors Plaintiffs.

At this point however, given the strong dissimilarity between the marks, and Plaintiffs' lackluster showing as to the strength of the marks, this factor (along with the conceded factors two, five, and six) is not enough to overcome the court's conclusion that, on balance, there is no genuine dispute of material fact. The likelihood of confusion is extremely low and precludes a finding of infringement.

### B. The Dilution Claim

---

[8] The Sixth Circuit has generally held that scant evidence of actual confusion does not weigh against a finding of infringement, and thus putative infringers do not generally "win" this factor. *Innovation Ventures, LLC v. Bhellion Enterprises Corp.*, 529 F. App'x 560, 564 n.2 (2013).

Defendant also moves for summary judgment on Plaintiffs' dilution claim on the ground that the dissimilarity of the marks precludes a finding of dilution and that 5-hour ENERGY is not a famous mark, as required for a finding of dilution. *See Audi AG v. D'Amato*, 469 F.3d 534, 547 (6th Cir. 2006). Plaintiffs, in their opposing brief, make no attempt to controvert these arguments. Instead, they wager the dilution claim on their belief that this court's Order at Docket No. 51 precludes Defendant's right to move for summary judgement on dilution.

The court's Order places no such limitation on Defendant. It merely states, "[f]ollowing the parties' completion of discovery on the likelihood-of-confusion factors, the court anticipates that Defendant will renew its motion for summary judgment." (Dkt. 51, Pg. ID 700.) Importantly, Defendant's original motion for summary judgment *did* include a request for adjudication of the dilution claim. (Dkt. 23.) Thus Plaintiffs were on notice that *renewal* of that motion might include, again, the dilution claim.

The court is left with Defendant's unopposed request for summary judgment on the dilution claim. Pursuant to Federal Rule of Civil Procedure 56(e), the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment , if appropriate, shall be entered against the adverse party." If the moving party meets its initial burden and the nonmoving party fails to respond, "its opportunity [to assist the court] is waived and its case wagered." *Guarino v. Brookfield Township Trs.*, 980 F.2d 399, 405 (6th Cir. 1992). The trial court must still "carefully review the legitimacy of such an unresponded-to motion, even as it refrains from actively pursuing advocacy or inventing the riposte for a silent party." *Id.* at 407. Evaluating the legitimacy of the unresponded-to motion, the

28

court agrees that the dissimilarity between Plaintiffs' and Defendant's marks precludes

success on the dilution claim, and that summary judgment is therefore appropriate.

## IV. CONCLUSION

For the foregoing reasons, IT IS ORDERED that Plaintiffs' Motion to Exclude the

Declaration of Robert Lauson (Dkt.74) is GRANTED IN PART.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment

(Dkt. 66) is GRANTED. The instant Motion does not address Plaintiff's copyright claim,

Count III of the Complaint, and thus that claim survives.


  s/Robert H. Cleland_____
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 30, 2016


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, March 30, 2016, by electronic and/or ordinary mail.

  s/Lisa Wagner_____
Case Manager and Deputy Clerk
(313) 234-5522